(Slip Opinion)

# Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security

The President may direct the Secretary of Commerce not to publish a confidential report to the President under section 232 of the Trade Expansion Act of 1962, notwithstanding a recently enacted statute requiring publication within 30 days, because the report falls within the scope of executive privilege and its disclosure would risk impairing ongoing diplomatic efforts to address a national-security threat and would risk interfering with executive branch deliberations over what additional actions, if any, may be necessary to address the threat.

January 17, 2020

MEMORANDUM OPINION FOR THE
DEPUTY COUNSEL TO THE PRESIDENT

In February 2019, the Secretary of Commerce submitted a report to the President under section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, advising him that imports of certain automobiles and automobile parts threaten to impair the national security and recommending action to address that threat. Although section 232 authorized the President to impose tariffs in response, the President deferred a decision on that remedy and instead directed the United States Trade Representative ("USTR") to pursue negotiations with foreign countries that are the sources of those imports. Section 232 contemplates that the Secretary will eventually publish his report to the President, *see id.* § 1862(b)(3)(B), but the Secretary has kept the report confidential while USTR's negotiations continue. In a recent appropriations act, however, Congress sought to accelerate the report's disclosure by requiring the Secretary to publish it by January 19, 2020. Commerce, Justice, Science, and Related Agencies Appropriations Act, 2020, Pub. L. No. 116-93, div. B, § 112, 133 Stat. 2317, 2385, 2395–96 (Dec. 20, 2019).

You have asked whether the President may direct the Secretary to withhold the report beyond the statutory deadline while negotiations continue and the President considers what additional measures may be necessary to address the national-security threat. We conclude that the Executive Branch may rely on the constitutional doctrine of executive privilege to decline to release the report at the deadline. The report is a confidential presidential communication, the disclosure of which would risk impairing ongoing diplomatic efforts to address a national-security

1

concern. Disclosure would also risk interfering with executive branch deliberations over what additional actions, if any, may be necessary to address the threat. Although Congress may have a legitimate interest in ultimately reviewing the report to understand the basis for the President's exercise of his section 232 authority, that generalized interest does not overcome the constitutionally rooted confidentiality interests that justify withholding the report until the resolution of diplomatic negotiations and action by the President.[1]

# I.

## A.

Section 232 of the Trade Expansion Act delegates to the President the authority to adjust imports in order to ensure that the Nation's domestic industrial capacity remains sufficient for the requirements of national security. *See* 19 U.S.C. § 1862(d). The statute broadly authorizes the President to take "action" that "in the judgment of the President . . . must be taken to adjust" imports "so that such imports will not threaten to impair the national security." *Id.* § 1862(c). Before the President may take such an action, however, the Secretary of Commerce must conduct, on request or his own motion, an "appropriate investigation to determine the effects on the national security of imports of the article." *Id.* § 1862(b)(1)(A). Within 270 days after the Secretary initiates the investigation, he "shall submit to the President a report on the findings of such investigation" and his recommendations "for action or inaction" under section 232. *Id.* § 1862(b)(3)(A). If the Secretary finds that the relevant imports "threaten to impair the national security," then the President has 90 days to decide whether he agrees with that finding. *Id.* § 1862(c)(1)(A). If the President does, then he shall "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A)(ii).

The President's authority under section 232 to adjust imports includes a range of options that may be used alone or in combination. He may

---

[1] In preparing this opinion, we consulted with the Office of the General Counsel of the Department of Commerce and the Office of the General Counsel of USTR.

impose a tariff or quota on imports of the article in question. *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976); *The President's Power to Impose a Fee on Imported Oil Pursuant to the Trade Expansion Act of 1962*, 6 Op. O.L.C. 74, 75–77 (1982). The President may also launch negotiations for agreements with other countries to address the threatened impairment of the national security. *See* 19 U.S.C. § 1862(c)(3)(A). The statute provides for the President to implement any such action within 15 days of that decision. *Id.* § 1862(c)(1)(B).[2] No later than 30 days after the decision, the President shall also report to Congress on "the reasons why the President has decided to take action, or refused to take action," under the statute. *Id.* § 1862(c)(2).

If the President chooses to pursue negotiations, and those negotiations do not remove the threat to national security, then the statute contemplates that the President may direct additional measures. If, after 180 days, no international agreement has been reached, or if any agreement "is not being carried out or is ineffective," then the President "shall take such other actions as the President deems necessary to adjust the imports of [the] article so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(3)(A). The statute provides that the President shall publish in the *Federal Register* notice of any such action taken, and similarly that he shall publish a determination to take no additional action. *Id.* § 1862(c)(3)(A), (B).

Section 232 contemplates that the Secretary of Commerce will publish the results of his investigation, except as necessary to protect classified or proprietary information. First, section 232 requires publication of "a report" "[u]pon the disposition of each request, application, or motion" for an investigation under section 232(b). *Id.* § 1862(d)(1); *see also* Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(d), 76 Stat. 872, 877

---

[2] We have repeatedly recognized that the President has authority to modify action he has taken to adjust imports under section 232 and its predecessors without a new investigation. *See, e.g.*, *Presidential Authority to Adjust Ferroalloy Imports Under § 232(b) of the Trade Expansion Act of 1962*, 6 Op. O.L.C. 557, 562 (1982) ("*Ferroalloy Imports*"); *Restrictions on Oil Imports*, 43 Op. Att'y Gen. 20, 21–23 (1975) (Saxbe, A.G.). The Court of International Trade recently concluded that the President lacks authority to modify his initial action, except insofar as he directs additional actions following unsuccessful negotiations under section 232(c)(3). *See Transpacific Steel LLC v. United States*, No. 19-142, 2019 WL 6124906, at *5–6 & n.15 (Ct. Int'l Trade Nov. 15, 2019). That conclusion has not yet been tested in an appellate court.

(original version of this provision).[3] Second, the statute requires that "[a]ny portion of the report submitted by the Secretary" to the President "which does not contain classified information or proprietary information shall be published in the Federal Register." 19 U.S.C. § 1862(b)(3)(B). We understand that the Department of Commerce implements these requirements by publishing an executive summary of the Secretary's report in the *Federal Register* and making the full report, except for classified and proprietary information, available for public inspection. *See* 15 C.F.R. § 705.10(c). Although section 232 requires the report's publication "upon the disposition" of the Secretary's investigation, the statute does not set any deadline for publication. Nor does section 232 address the timing of publication when, as here, the President acts on the report's recommendations by directing negotiations with foreign countries.

## B.

On May 23, 2018, the Secretary of Commerce initiated an investigation under section 232 into the effects on the national security of imports of certain automobiles and automobile parts. *See* Notice of Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts, 83 Fed. Reg. 24,735 (May 30, 2018). On February 17, 2019, the Secretary submitted a report to the President containing the results of that investigation.

---

[3] Section 232 succeeded two other statutes conferring similar authority on the President. *See* Trade Agreements Extension Act of 1958, Pub. L. No. 85-686, § 8, 72 Stat. 673, 678–79; Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 7, 69 Stat. 162, 166. Both statutes authorized the President to adjust imports of an article based upon the investigation and recommendation of a subordinate regarding whether the imports threaten national security. Section 8(d) of the 1958 Act required publication of "[a] report" "upon the disposition" of the investigation. 72 Stat. at 679. Section 7 of the 1955 Act did not address publication. 69 Stat. at 166. The 1955 Act charged the Director of the Office of Defense Mobilization with the investigation and recommendation. *See id.* Congress transferred this function to the Secretary of the Treasury in the Trade Act of 1974, Pub. L. No. 93-618, § 127(d)(1), 88 Stat. 1978, 1993 (Jan. 3, 1975). President Carter transferred this function to the Secretary of Commerce in section 5 of Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 69,273, 69,274 (Dec. 3, 1979), and Congress codified the Secretary of Commerce's role in 1988, *see* Omnibus Trade and Competitiveness Act, Pub. L. No. 100-418, § 1501, 102 Stat. 1107, 1258.

On May 17, 2019, the President issued a proclamation noting his concurrence in "the Secretary's finding that automobiles and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States." Proclamation No. 9888, 84 Fed. Reg. 23,433, 23,434 (May 21, 2019). As described in the proclamation, the report found that the United States' defense-industrial base depends upon the American-owned automotive sector for the development of technologies vital to the national security. *See id.* ¶¶ 2–3, 84 Fed. Reg. at 23,433. Imports of automobiles and automobile parts, however, have displaced American-owned production, in part because of foreign protective barriers that disadvantaged American-owned manufacturers. *See id.* ¶¶ 3–5, 84 Fed. Reg. at 23,433. The resulting displacement in the American-owned automotive industry threatened to weaken U.S. technological leadership in an area vital to the national defense. *See id.* ¶¶ 6–8, 84 Fed. Reg. at 23,433–34. Accordingly, the Secretary concluded that "the present quantities and circumstances of automobile and certain automobile parts imports threaten to impair the national security" of the United States. *Id.* ¶ 9, 84 Fed. Reg. at 23,434.

While concurring in the Secretary's finding, the President chose not to invoke his section 232 authority to impose tariffs or quotas on imports of automobiles or automobile parts. The Secretary had recognized that "successful negotiations could allow American-owned automobile producers to achieve long-term economic viability" and "develop cutting-edge technologies that are critical to the defense industry." *Id.* ¶ 11, 84 Fed. Reg. at 23,434. The President thus directed USTR to "pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate." *Id.* cl. 1, 84 Fed. Reg. at 23,435.[4] USTR advises that negotiations remain ongoing, but have not yet produced an agreement that addresses the national-security threat. We are also advised that the President has not yet decided what, if any, "other actions" to take under section 232(c)(3)(A) to adjust imports of automobiles and automobile parts,

---

[4] The cited provision, section 232(c)(3)(A)(i), refers to agreements that "limit[] or restrict[] the importation into, or the exportation to, the United States of the article that threatens to impair national security."

including whether to impose tariffs or quotas on those imports. In view of pending international negotiations and executive branch deliberations, the Secretary of Commerce has not yet published his report.

On December 20, 2019, Congress enacted the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2020, as part of a consolidated appropriations act. The Act purports to direct the Secretary of Commerce to publish his February 2019 report to the President within 30 days. In particular, section 112 of the Act states:

> Not later than thirty days after the date of the enactment of this Act, using amounts appropriated or otherwise made available in this title for the Bureau of Industry and Security for operations and administration, the Secretary of Commerce shall—
>
> (1) publish in the Federal Register the report on the findings of the investigation into the effect on national security of imports of automobiles and automotive parts that the Secretary initiated on May 23, 2018, under section 232(b) of the Trade Expansion Act of 1962 (19 U.S.C. 1862(b)), as required under paragraph (3)(B) of that section; and
>
> (2) submit to Congress any portion of the report that contains classified information, which may be viewed only by Members of Congress and their staff with appropriate security clearances.

Pub. L. No. 116-93, div. B, § 112, 133 Stat. at 2395–96. Upon signing the Act, the President noted that certain provisions, including section 112, "purport to mandate or regulate the dissemination of information that may be protected by executive privilege." Statement on Signing the Consolidated Appropriations Act, 2020, 2019 Daily Comp. Pres. Doc. No. DCPD201900881, at 2 (Dec. 20, 2019). Accordingly, the President determined that his Administration would "treat these provisions consistent with the President's constitutional authority to control information, the disclosure of which could impair national security, foreign relations, the deliberative processes of the executive branch, or the performance of the President's constitutional duties." *Id.*

Section 112's 30-day deadline for publishing the report in the *Federal Register* falls on January 19, 2020. Section 112(2) is not at issue because the report contains proprietary information but not any classified information. The question, then, is whether the President's constitutional authority to control privileged information permits him to direct the

Secretary not to comply with the publication deadline in section 112(1) at this time.

## II.

Section 112 purports to require the Secretary of Commerce to publish his report to the President by January 19, 2020, even though the Executive Branch remains engaged in active deliberations and ongoing international negotiations about the very subject addressed in the report. That requirement implicates confidentiality interests rooted in the doctrine of executive privilege. Executive privilege is a "constitutionally based" "corollary of the executive function vested in the President by Article II of the Constitution," and it empowers the President to withhold confidential information from the other Branches and the public when necessary to support that function. *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Congressional Requests*"); *see also United States v. Nixon*, 418 U.S. 683, 705–06 (1974). Because the Secretary's report falls within the scope of executive privilege, it is presumptively protected from disclosure.

## A.

The Secretary's report is protected by executive privilege. It is a quintessential privileged presidential communication—a report from a Cabinet Secretary to the President advising him of the officer's opinions and recommending decisions by the President. The report is also protected by the deliberative process component of executive privilege, because it reflects a recommendation made in connection with deliberations over the President's final decision. In addition, disclosure of the full report at this time could compromise the United States' position in ongoing international negotiations. The Executive Branch accordingly has strong confidentiality interests in the report.

### 1.

The presidential communications component of executive privilege clearly applies to confidential advice that an agency head provides to the President. The courts have recognized that the privilege covers "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."

*In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). In *United States v. Nixon*, the Supreme Court explained that this privilege protects "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking" by ensuring that the President and his advisers are "free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. at 708. The privilege for presidential communications is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.*

The report at issue is a confidential communication to the President containing a Cabinet Secretary's advice on decisions delegated by statute to the President—whether automobile and automobile-part imports "threaten to impair the national security" and whether they should be adjusted to remove that threat. 19 U.S.C. § 1862(b)(3)(A). The report is therefore a core presidential communication. *See, e.g.*, *Loving v. Dep't of Def.*, 550 F.3d 32, 39 (D.C. Cir. 2008) ("easily" holding that "memoranda from the Army and Defense Secretaries directly to the President advising him" on his statutory review of a court-martial death sentence "fall squarely within the presidential communications privilege"). The presidential communications privilege applies to the report in its entirety. *See Sealed Case*, 121 F.3d at 745–46.

This conclusion is not affected by the fact that the report reflects the exercise of statutory authority delegated to the President pursuant to Congress's constitutional powers to impose "Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. The presidential communications component of executive privilege protects the President's power to faithfully execute all of the laws. Communications related to the President's independent constitutional functions may raise "particularly strong" confidentiality concerns, *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 2 (2007) (Clement, Act'g A.G.), but the privilege applies equally to communications concerning the execution of statutes, *see, e.g.*, *Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request*, 32 Op. O.L.C. 1, 3 (2008) (Mukasey, A.G.); *Assertion of Executive Privilege for Memorandum to the President Concerning Efforts to Combat Drug Trafficking*, 20 Op. O.L.C. 8, 8 (1996) (Reno, A.G.).

Indeed, this Office has previously advised that executive privilege protects the confidentiality of communications regarding the President's use of his section 232 authority. On April 2, 1980, President Carter imposed a gasoline-conservation fee under the authority of section 232 following an investigation by the Secretary of the Treasury (who was previously responsible for investigations under section 232). *See* Proclamation No. 4744, 45 Fed. Reg. 22,864 (Apr. 3, 1980).[5] After a House subcommittee subpoenaed documents related to the President's decision, this Office advised that the President had the constitutional authority to protect the confidentiality of executive branch deliberations, including those related to his decision to issue the section 232 proclamation. *See* Memorandum for the Attorney General from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee* at 9–12 (Jan. 13, 1981). The ability of the President to receive such advice from an agency head directly implicates his power to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." U.S. Const. art. II, § 2, cl. 1.

## 2.

The deliberative process component of executive privilege also applies to the Secretary of Commerce's report. This aspect of executive privilege likewise has constitutional roots. *See, e.g.*, *Assertion of Executive Privilege with Respect to Prosecutorial Documents*, 25 Op. O.L.C. 1, 2 (2001) (Ashcroft, A.G.). It "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). The privilege protects materials that are "predecisional" and "deliberative" in nature, though it does not extend to "purely factual" material. *Judicial*

---

[5] The fee was invalidated by a district court. *See Indep. Gasoline Marketers Council, Inc. v. Duncan*, 492 F. Supp. 614, 618–19 (D.D.C. 1980). This Office later described the fee as "clearly . . . the type of presidential action . . . not authorized by § 232." *Ferroalloy Imports*, 6 Op. O.L.C. at 561.

*Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (quoting *Sealed Case*, 121 F.3d at 737).

The report, almost by definition, comprises predecisional and deliberative material. Under section 232, the report presents the Secretary's "findings," after his investigation, on whether the imports in question threaten the national security. 19 U.S.C. § 1862(b)(3)(A). The Secretary is required, based on those findings, to make "recommendations . . . for action or inaction" by the President and, ultimately, to "advise the President" regarding whether the relevant imports threaten to impair the national security and what action the President should take. *Id.*[6] The report is predecisional because it "precedes, in temporal sequence," the President's ultimate findings and policy decisions under section 232; and it is deliberative because it "was written as part of the process by which" the President comes to those decisions under section 232. *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898–99 (D.C. Cir. 2015) (Kavanaugh, J.) (internal quotation marks omitted). The Secretary's report served the predecisional and deliberative functions contemplated by section 232. Proclamation No. 9888, ¶¶ 2–11, 84 Fed. Reg. 23,433–44 (summarizing the report).[7]

The Executive Branch's interest in protecting the confidentiality of this deliberative material is especially strong because the deliberative process remains ongoing. *See Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 373 (4th Cir. 2009) (deliberative communications related to "ongoing patent reexaminations" were "naturally" protected by deliberative process privilege); *Congressional Requests*, 13 Op. O.L.C. at 160 ("in-

---

[6] Some of the material in the report is "purely factual," which would generally not be protected by the deliberative process privilege. *Judicial Watch*, 365 F.3d at 1113. In this context, however, disclosing that material would still reveal significant substantive aspects of the Secretary's confidential advice to the President. We think that this factual material is likely "'inextricably intertwined with policy-making processes'" and thus protected as deliberative. *Id.* at 1121 (quoting *Soucie v. David*, 448 F.2d 1067, 1078 (D.C. Cir. 1971)). Regardless, such factual material would be independently protected as a presidential communication, which characterizes the report in its entirety.

[7] The proclamation's summary of and quotation from certain portions of the report did not waive or forfeit executive privilege over the remainder of the report. *See Sealed Case*, 121 F.3d at 741 (explaining that an "all-or-nothing approach has not been adopted with regard to executive privileges generally," so "release of a document only waives these privileges for the document or information specifically released, and not for related materials").

formation concerning ongoing deliberations need rarely be disclosed"); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) (Smith, A.G.) ("the interference with the President's ability to execute the law is greatest while the decisionmaking process is ongoing"). The President has not decided what, if any, "other actions" to take to adjust imports to address the national-security threat identified by the Secretary. 19 U.S.C. § 1862(c)(3)(A).

The statute continues to authorize the President to take action to adjust imports of automobiles and automobile parts under section 232. Following the Secretary's initial transmission of the report, the President had 90 days to decide whether he concurred in the Secretary's findings and to determine what action to take in response. *Id.* § 1862(c)(1)(A). Once the President decided to address the threat by ordering negotiations, he had 15 days to implement that action. *Id.* § 1862(c)(1)(B). Because the resulting negotiations did not produce an agreement within 180 days, the President is now authorized to "take such other actions as the President deems necessary to adjust imports of such article so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(3)(A).

There is, however, no statutory deadline for the President to exercise that power. Congress specifically amended the statute in 1988 to add some specific deadlines for the President to act in response to the Secretary's report—the 90- and 15-day periods noted above. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1501(3), 102 Stat. 1107, 1258. But in contrast with the President's initial determination, which must be made "[w]ithin 90 days" and "implement[ed] . . . by no later than" 15 days after the determination, 19 U.S.C. § 1862(c)(1)(A), (B), the statute does not set any further deadline for presidential action after the conclusion of the 180-day negotiation period. In giving the President the discretion to take "such other actions as the President deems necessary" after that period, *id.* § 1862(c)(3)(A), Congress did not require the President to act within any particular timeframe. It instead provided him with discretion to shape an appropriate action, including with respect to continuing the international negotiations that are the basis for invoking this part of section 232. Here, the decision-making process expressly contemplated by section 232 remains ongoing, giving the Executive Branch a strong confidentiality interest in predecisional, deliberative material relevant to the ongoing process of deciding how to exercise that authority.

**3.**

Finally, the disclosure of the report implicates well-established confidentiality interests in protecting information the disclosure of which would risk damaging ongoing diplomatic negotiations. Given the President's role "as Commander-in-Chief and as the Nation's organ for foreign affairs," *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948), executive privilege is at its most potent when applied to national-security and diplomatic materials. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *Nixon*, 418 U.S. at 710. We have long recognized that "the President has the power to withhold from [Congress] information in the field of foreign relations or national security if in his judgment disclosure would be incompatible with the public interest." Memorandum from John R. Stevenson, Legal Adviser, Department of State, and William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Executive Privilege to Withhold Foreign Policy and National Security Information* at 7 (Dec. 8, 1969). Many of the earliest assertions of what we now call executive privilege involved protecting the secrecy of information to avoid undermining the President's conduct of diplomacy.

The report at issue plainly implicates information in the field of foreign relations and national security. "Presidential action under [section 232] . . . is closely linked to questions of national security, and also to the foreign relations of the United States." Memorandum for John W. Dean III, Counsel for the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Mandatory Oil Import Program*, att. at 11 (Mar. 3, 1972). We have accordingly described recommendations to the President under section 232 as reflecting "confidential advice given to the President in the field of national security." *Id.* at 13. Section 232, moreover, expressly contemplates that the President may choose, as a means of addressing a national-security threat, to negotiate agreements with foreign countries. 19 U.S.C. § 1862(c)(1), (3). Consistent with this statutory design, the report here identifies a threatened impairment of the national security and recommends diplomatic negotiations. *See* Proclamation No. 9888, ¶¶ 11, 14–15, 84 Fed. Reg. at 23,434–35. The report contains detailed analysis concerning the nature of the problem at the heart of those negotiations and therefore bears directly upon the United States' objectives in the negotiations. It is also suggestive of what measures the United States believes might satisfy those objectives, including what other

measures the Secretary believes the United States should be prepared to take to adjust imports of automobiles and automobile parts. The report in these respects is akin to a set of diplomatic instructions, and USTR has advised us that disclosing the report at this time could negatively affect the position of the United States in ongoing negotiations.

As Attorney General Reno observed, "[h]istory is replete with examples of the Executive's refusal to produce to Congress diplomatic communications and related documents because of the prejudicial impact such disclosure could have on the President's ability to conduct foreign relations." *Assertion of Executive Privilege for Documents Concerning Conduct of Foreign Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 6 (1996). In our prior opinions, we have described examples of withholdings of diplomatic instructions and related documents by the Washington, Adams, Jackson, Polk, and Fillmore Administrations. *See History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress: Part I—Presidential Invocations of Executive Privilege Vis-à-Vis Congress*, 6 Op. O.L.C. 751, 753–54, 756–57, 762–64 (1982) ("*History of Refusals*"). President Washington, for example, withheld from the Senate in 1794 certain diplomatic correspondence with France, and he withheld from the House of Representatives in 1796 various documents related to the negotiation of the Jay Treaty. *See id.* at 753–54. As Washington explained in declining to produce instructions to one of his diplomatic representatives, "a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated" would have an obvious adverse impact on negotiations to which such matters pertain. Message to the House of Representatives (Mar. 30, 1796), *reprinted in* 1 *A Compilation of the Messages and Papers of the Presidents* 194–95 (James D. Richardson ed., 1896) ("*Messages and Papers*"). Washington made that objection even though the House resolution excepted any documents pertaining to "existing negotiations." *Id.* at 194.

Presidents likewise have repeatedly resisted demands for the disclosure of material that would damage ongoing negotiations. In 1832, President Jackson declined to disclose correspondence regarding discussions between the United States and the Republic of Buenos Aires "so long as the negotiation shall be pending." Message to the House of Representatives (Dec. 28, 1832), *reprinted in* 2 *Messages and Papers* at 608–09.[8] In 1848,

---

[8] In 1833, President Jackson also declined to divulge to the Senate a "conditional arrangement" made between commissioners appointed by Jackson and the State of Maine

President Polk argued that his objections to disclosing materials related to negotiations with Mexico "are much stronger than those which existed" when President Washington withheld the Jay Treaty materials because the negotiations "have not been terminated, and may be resumed." Message to the House of Representatives (Jan. 12, 1848), *reprinted in* 4 *Messages and Papers* at 567 (1897). Other Presidents have echoed Jackson's and Polk's views. *See, e.g.*, *History of Refusals*, 6 Op. O.L.C. at 765 (describing President Fillmore's withholding of documents related to a claim against Mexico that "was still being negotiated"); *id.* at 770 (describing President Hoover's view that "[t]he Executive was under a duty, in order to maintain amicable relations with other nations, not to publicize every negotiating position and statement which preceded final agreement" on a treaty). The Executive Branch thus has a strong and historically well-founded interest in delaying publication of the report for so long as it may affect ongoing diplomatic negotiations.

## B.

In concluding that executive privilege applies to the report, we have considered potential counterarguments arising out of the origins and nature of the report. Specifically, we recognize that the report was drafted in connection with a statutory process that contemplates its eventual public disclosure, and that publication could be viewed as a condition on the President's exercising the authority delegated under section 232. We do not believe, however, that either the statutory origin of the report or its connection to the President's exercise of delegated authority means that executive privilege is inapplicable.

### 1.

Even before the enactment of section 112 of the appropriations act, section 232 provided that the Secretary of Commerce would both create and eventually publish the report. 19 U.S.C. § 1862(b)(3)(A)–(B), (d)(1). Accordingly, it could be argued that executive officials do not have any

---

while the United States negotiated with Great Britain regarding the northeastern boundary. Message to the President of the Senate (Mar. 2, 1833), *reprinted in* 2 *Messages and Papers* at 637; *see also History of Refusals*, 6 Op. O.L.C. at 757. Jackson's reasons for withholding this information are not entirely clear, but it appears that he may have intended to avoid affecting the progress of ongoing negotiations with Great Britain.

confidentiality interests in the report because, even though it was addressed to the President, they prepared the report knowing it would eventually be disclosed. We do not think this fact makes privilege unavailable. First, by requiring that the report be disclosed now, section 112 requires a different kind of disclosure than was contemplated at the time the report was drafted. Second, even with respect to the eventual disclosure contemplated under section 232, the publication mandate does not make executive privilege categorically unavailable. To the contrary, executive privilege remains available for statutory reports so long as their disclosure would impair established executive branch confidentiality interests.

As a threshold matter, the question is not whether the report should be disclosed, but when. At the time the report was submitted, section 232 governed publication, but that statute does not require, and has never required, the Secretary's report to the President to be disclosed on any particular timeline. Instead, the statute simply says that the unclassified portions of such reports "shall be published in the Federal Register," and that "[u]pon the disposition of each" investigation, the Secretary shall publish "a report on such disposition." 19 U.S.C. § 1862(b)(3)(B), (d)(1). The statutory requirement to publish the Secretary's report to the President dates from the 1988 amendments, which codified the Department of Commerce's then-existing regulations requiring publication of the report upon the disposition of the investigation. 15 C.F.R. § 359.10(c) (1988). A "disposition" of the investigation does not occur until the President has decided whether to adjust imports. *See Presidential Authority to Adjust Ferroalloy Imports Under § 232(b) of the Trade Expansion Act of 1962*, 6 Op. O.L.C. 557, 562–63 (1982) (recognizing that the President's decision "to retain the [Commerce] Report for further study or to return it to the Commerce Department for further evaluation would not constitute a final disposition" for purposes of the publication requirement); *see also* H.R. Rep. No. 87-1818, at 41 (1962) ("Section 232(d) requires a report to be made and published on each *final* disposition of any request for investigation under section 232(b)." (emphasis added)). Section 232, and the Department of Commerce's administration of it, are therefore sufficient to protect the Executive Branch's confidentiality interests in the report unless or until the President has made his decision.

Consistent with section 232's framework, the Secretary of Commerce (like those officials previously responsible for conducting such national-security investigations) has typically published the report to the President only after the decisional process has concluded. When the Secretary's

investigation concludes that the imports in question do not threaten national security, then the publication of the report necessarily occurs at the conclusion of the deliberative process, because the President may act only if the Secretary finds a national-security threat. In such cases, the submission of the Secretary's report represents the final decision and the conclusion of the deliberative process. *See* 19 U.S.C. § 1862(b)(3)(A).

By contrast, when a section 232 investigation finds that imports do present a national-security threat, the general practice appears to have been to disclose the report only after the President decides whether and how to adjust imports. In February 1959, for example, the Director of the Office of Civil and Defense Mobilization, who exercised the Secretary's authority under section 232's statutory predecessor, *see supra* note 3, advised the President of his determination that imports of crude oil and its derivatives threatened to impair the national security and promised that, "[a]s required by the statute, a report of this investigation will be made and published shortly." Memorandum for the President from Leo A. Hoegh, Director, Office of Civil and Defense Mobilization, *reprinted in Small Business Problems Created by Petroleum Imports: Hearings Before Subcomm. No. 4 of the Select Comm. on Small Bus.*, 87th Cong. app. II, at 920–22 (1962) ("*Petroleum Imports Hearings*").[9] President Eisenhower imposed import restrictions in Proclamation No. 3279 on March 10, 1959, 24 Fed. Reg. 1781 (Mar. 12, 1959), but the Director did not submit his statutory report to Congress until the following July. *Report of Investigation of Imports of Crude Oil and Its Derivatives and Products* (July 21, 1959), *reprinted in Petroleum Imports Hearings* app. II, at 925–30.

Similarly, on January 14, 1975, the Secretary of the Treasury submitted a report to President Ford advising him that imports of crude oil and related products threatened to impair the national security. *See* Effects of Imported Articles on the National Security, 40 Fed. Reg. 4457, 4457 (Jan. 30, 1975). The Secretary did not publish that report until a week after the President's January 23 proclamation imposing supplemental fees on the imports, Proclamation No. 4341, 40 Fed. Reg. 3965 (Jan. 27, 1975). More recently, the Secretary of Commerce has typically waited until months

---

[9] The Office of Defense Mobilization was renamed the Office of Defense and Civilian Mobilization in Reorganization Plan No. 1 of 1958. *See* 23 Fed. Reg. 4991, 4991 (July 1, 1958). The Trade Agreements Extension Act vested this office with the investigation and recommendation function. *See* Pub. L. No. 85-686, § 8, 72 Stat. at 678; *see also supra* note 3.

after the President's decision before publishing a summary of the report in the *Federal Register*.[10] That practice is consistent with the Executive Branch's long-standing confidentiality interest in delaying the report's disclosure until its findings have been fully considered and the President has made his decision. The Secretary's February 2019 report on automobile and automobile-part imports thus was issued at a time when the Executive Branch had a legitimate confidentiality interest in delaying the release of the report until after the President had made a decision whether to adjust imports to respond to the underlying national-security threat.

Moreover, even if the terms of section 232 and prior practice did not demonstrate such solicitude for protecting the ongoing decision-making process, executive privilege still applies to reports called into being by federal statutes. As a constitutional prerogative of the President, executive privilege may not be eliminated by statute. *See, e.g.*, *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 13 (1988) (if a privilege is "constitutionally rooted," Congress may not "determine for itself which privileges the Government may avail itself of and which it may not"); Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant

---

[10] *See, e.g.*, Summary of Secretarial Report Under Section 232 of the Trade Expansion Act of 1962, as Amended, on the Effect of Imports of Crude Oil on the National Security, 65 Fed. Reg. 46,427, 46,427 (July 28, 2000) (President decided to take no action on March 24, 2000); Summary of Secretarial Report Under Section 232 of the Trade Expansion Act of 1962, as Amended, 60 Fed. Reg. 30,514, 30,515 (June 9, 1995) (President decided to take no action on February 16, 1995); Presidential Decision; Petroleum Section 232 National Security Import Investigation, 54 Fed. Reg. 6556, 6557 (Feb. 13, 1989) (President decided to take no action on January 3, 1989); Presidential Decision; Anti-Friction Bearing Section 232 National Security Import Investigation, 54 Fed. Reg. 1974, 1975 (Jan. 18, 1989) (President decided to take no action on November 28, 1988).

We have identified only two examples of earlier publication. In 1979, the Department of the Treasury published a section 232 report about oil imports over a year before President Carter issued a proclamation acting on the report's recommendations. *See* Effect of Oil Imports on National Security, 44 Fed. Reg. 18,818 (Mar. 29, 1979); Proclamation No. 4744, 45 Fed. Reg. 22,864 (Apr. 3, 1980); *see also Indep. Gasoline Marketers Council*, 492 F. Supp. at 616 (reviewing chronology). (At the time, section 232 did not impose any deadline on the President to act in response to Treasury's report. 19 U.S.C. § 1862(b) (1976); *see also Ferroalloy Imports*, 6 Op. O.L.C. at 562.) In 2018, the Department of Commerce released (but did not publish in the *Federal Register*) two section 232 reports about imports of steel and aluminum, both within a month of their completion and before the President had concurred with them and taken responsive action. *See* Press Release, Secretary Ross Releases Steel and Aluminum 232 Reports in Coordination with White House (Feb. 16, 2018).

Attorney General, Office of Legal Counsel at 3 n.6 (Sept. 8, 1986) ("Congress cannot override executive privilege by statutory enactment"). Thus, Congress may not eliminate the confidentiality of executive branch deliberations by directing officials to communicate their opinions to the President through publicly available reports.

For this reason, the Department of Justice has regularly objected to proposed legislation that would require the disclosure of materials prepared pursuant to statute. *See, e.g.*, Letter for Paul D. Ryan, Speaker, U.S. House of Representatives, from Stephen E. Boyd, Assistant Attorney General, Office of Legislative Affairs (Dec. 11, 2017) (objecting to section 108(a) of H.R. 4243, the VA Asset and Infrastructure Review Act of 2017); *cf. Loving*, 550 F.3d at 35, 39–41 (applying executive privilege to documents "prepared for the President in connection with his statutory review of [a] death sentence"); *Congressional Requests for Information from Inspectors General Concerning Open Criminal Investigations*, 13 Op. O.L.C. 77, 83–87 (1989) ("*Inspector General Requests*") (construing the Inspector General Act to permit agency heads to withhold privileged information when disclosing statutory reports to Congress). This Office has long objected to so-called "direct reporting" requirements based upon the applicability of executive privilege to statutory reports. *See Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27, 43–46 (2008). Likewise, we have explained that Congress may not require disclosure of legal advice provided within the Executive Branch, free from any constraint of privilege, simply by subjecting all such advice to a statutory reporting requirement. *See, e.g.*, *Constitutionality of the OLC Reporting Act of 2008*, 32 Op. O.L.C. 14 (2008) (Mukasey, A.G.) (objecting on constitutional grounds to a bill that would have required disclosure of "authoritative" legal interpretations issued within the Department of Justice).

Congress itself has recognized that the Executive Branch may have legitimate confidentiality interests in the contents of statutorily required reports, *see, e.g.*, *Inspector General Requests*, 13 Op. O.L.C. at 85–87 (reviewing legislative history of the Inspector General Act acknowledging such interests), including in reports bearing on delegated statutory authority to regulate foreign commerce. Congress acknowledged some such interests by excluding classified information from the publication

requirement in section 232(b)(3)(B).[11] To take another example from a related statute, Congress authorized the withholding of any "information . . . determine[d] to be confidential" upon publication of certain reports for the President in various provisions of the Trade Act of 1974. 19 U.S.C. §§ 2252(f)(3), 2274(b), 2354(b), 2401c(b), 2436(a)(4). As further explained in Part II.A.1 above, executive privilege may apply to the Secretary of Commerce's report even though it was prepared pursuant to statutory direction.

## 2.

We further conclude that executive privilege applies even though the requirement for the eventual disclosure of the report could be viewed as a condition on the Executive Branch's exercise of delegated statutory authority under section 232. The new publication requirement imposed by section 112 does not reflect a condition imposed upon a choice within the discretion of the Executive Branch. Section 112 is not conditional: it commands the Secretary of Commerce to publish the preexisting report within 30 days. 133 Stat. at 2395–96. Section 112 does not give the Executive Branch the option of avoiding publication by declining to conduct a section 232 investigation or to invoke the President's authority under section 232. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) (Congress may not "surpris[e] participating States with post-acceptance or 'retroactive' conditions" on federal funding). The statutory provision addresses a preexisting report and requires publication within 30 days.

---

[11] In fact, the Department of Justice objected on privilege grounds to a proposed version of section 232(b)(3)(B) that would have provided that the Secretary of Commerce's report to the President "may be classified only if public disclosure of such report, or of such portion of such report, would clearly be detrimental to the security of the United States." Memorandum for John C. Filippini, Chief, Legislative Unit, Antitrust Division, from Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: S. 490, "Omnibus Trade Act of 1987"* at 4 (Apr. 14, 1987); *see also* Letter for Howard A. Baker, Jr., Chief of Staff for the President, from Arnold I. Burns, Deputy Attorney General at 2 (June 16, 1987) (describing this objection); H.R. Rep. No. 100-576, at 711 (1988) (noting deletion of the "clearly detrimental" requirement). Although the Department did not object more broadly to the publication requirement, that is likely because the Executive Branch had a general practice of disclosing unclassified portions of section 232 reports for more than two decades, upon the disposition of the investigations.

Even apart from the retroactive nature of this disclosure requirement, we have recognized limits on Congress's authority to impose conditions upon the President's exercise of delegated congressional authority. *See, e.g.*, *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 275–76 (1996). This principle would apply with particular force where, as here, a statute purports to require the disclosure of information implicating foreign affairs and national security. *See Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261–62 (1989) ("*Congressional Notification for Covert Actions*"). We need not address how this principle would apply to publication of the report at issue, however, because section 112 is not a condition on the exercise of delegated authority, but a freestanding disclosure requirement imposed on a preexisting report.

## III.

Our determination that the Secretary of Commerce's report falls within the scope of executive privilege does not conclude the analysis. In *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), the Supreme Court assessed a claim that a federal statute impermissibly infringed upon executive privilege by asking whether there were "adequate justifications" for the statute's "intrusion into executive confidentiality." *Id.* at 452. The Court applied a balancing test that it viewed as similar to that applied in *United States v. Nixon*, measuring "Congress' purposes in enacting" the statute against the degree to which disclosure would intrude upon executive branch confidentiality interests. *Id.* (citing *United States v. Nixon*, 418 U.S. 683). Here, we believe that Congress has not demonstrated an adequate justification for requiring the disclosure of the report now, before the deliberative process has concluded and while disclosure of the report could threaten ongoing international negotiations.

In *Nixon v. Administrator*, the Court upheld a statute that provided government archivists with custody over and access to President Nixon's records. In so doing, the Court considered the interests served by the statute, which ensured that the incumbent President would have "access to records of past decisions that define or channel current governmental obligations" and that the records would otherwise be preserved for historical purposes. *See* 433 U.S. at 452–53. In weighing these justifications

against the "limited intrusion" on executive confidentiality, the Court estimated that only a small fraction of the papers (one-half of one percent) would be covered by privilege and emphasized that the statute preserved the former President's ability to claim privilege before the public release of any particular records, since the only access at issue was that of government archivists. *See id.* at 449–52.

By contrast with the records law at issue in that case, section 112 targets a single, privileged document and requires near-immediate public release. Section 112(1) provides that the Secretary shall publish the report "as required under paragraph (3)(B)" of section 232(b) within 30 days. Because section 232 already requires eventual public disclosure, section 112's legal effect is simply to accelerate the required publication. In testifying on the proposed disclosure provision that would become section 232(b)(3)(B), Senator Byrd stated that it would "increase[] the visibility of the entire section 232 process" by enabling Congress and the public "to know the basis on which . . . decisions are made" under the statute. *Hearing on S. 1871 Before the S. Comm. on Fin.*, 99th Cong. 25 (1986). But the congressional or public interest in understanding the basis for the President's decision under section 232 is a weak justification for requiring disclosure of a privileged document before the President has made that decision.

The President's May 2019 proclamation already provided a substantial explanation for the basis of his concurrence in the Secretary's finding that imports of automobiles and automobile parts threaten the national security. "American-owned producers' share of the domestic automobile market," the President explained, "has contracted sharply, declining from 67 percent . . . in 1985 to 22 percent . . . in 2017." Proclamation No. 9888, ¶ 4, 84 Fed. Reg. at 23,433. Quoting the Secretary's report, the President explained that "'[t]he contraction of the American-owned automotive industry, if continued, will significantly impede the United States' ability to develop technologically advanced products that are essential to our ability to maintain technological superiority to meet defense requirements and cost effective global power projection.'" *Id.* ¶ 8, 84 Fed. Reg. at 23,434. The President also separately submitted to Congress a letter that, as section 232 requires, provided a "written statement of the reasons why the President has decided to take action" to adjust imports. 19 U.S.C. § 1862(c)(2); *see* Letter to Congressional Leaders on the Effects of Imports of Automobiles and Certain Automobile Parts on the National Security of the United States, 2019 Daily Comp. Pres. Doc. No.

DCPD201900400 (June 14, 2019). These explanations already go a substantial way toward explaining the basis for the President's initial decision.

We do not doubt that Congress may also have a legitimate interest in reviewing the Secretary's report to understand how the President has exercised his authority under section 232. Some members of Congress have introduced bills that would alter the President's authority under section 232 to adjust imports. *See* Trade Security Act of 2019, S. 365, 116th Cong. (2019); Bicameral Congressional Trade Authority Act of 2019, S. 287, 116th Cong. (2019). But it is hard to see how Congress's legislative interest would be significantly advanced by mandating disclosure of the report now, as opposed to after the conclusion of international negotiations and the President's decision-making process. As then–Assistant Attorney General Barr explained in an analogous context, the fact that Congress may have a legitimate interest in being informed about a matter after the fact—there, the conduct of a covert action abroad—does not mean that Congress may require disclosure of such a matter when disclosure would threaten to harm the national security. *See Congressional Notification for Covert Actions*, 13 Op. O.L.C. at 261–62.

To the extent that Congress seeks public disclosure of the report now, before the President has made a decision, in order to influence his future decision, we do not believe that would present a legitimate justification for intruding upon the confidentiality of the Executive Branch. Congress has no constitutional role in executing the laws. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 733–34 (1986) ("[O]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation."); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826–27 (D.C. Cir. 1993) (holding that Congress could not require the presence of non-voting congressional appointees on the Federal Election Commission). Congress thus may not demand disclosure of information as a means of facilitating congressional participation in the execution of the law. *See Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. at 30 (when "'oversight' is used as a means of participating directly in an ongoing process of decision within the Executive Branch, it oversteps the bounds of the proper legislative function"). While Congress may enact legislation either to curtail the President's statutory authority to adjust automobile imports or to adjust imports itself, we do not believe that Congress may seek to participate in an ongoing

decision-making process by requiring the Executive Branch to disclose confidential information.

In sum, the immediate publication of the Secretary's report would serve a generalized informational interest that would seem to provide little justification for immediate publication. We are presented with the reverse, in some sense, of the balance struck in *United States v. Nixon*, where the Supreme Court held that a "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." 418 U.S. at 713. Here, we similarly conclude that the generalized interest in immediate disclosure of the report does not justify infringing on the Executive Branch's strong, specific, and continuing interest in maintaining the confidentiality of the report. *See Nixon v. Adm'r*, 433 U.S. at 452. The Executive Branch may rely on the constitutional doctrine of executive privilege to decline to release the report at the statutory deadline, and the President therefore may direct the Secretary of Commerce not to disclose it at this time.

## IV.

This conclusion does not mean that the Secretary of Commerce's report should remain confidential forever. Whether the Executive Branch may withhold information on privilege grounds depends upon the facts. *See United States v. Nixon*, 418 U.S. at 694, 697, 713 (highlighting that the materials at issue were sought for use in a pending criminal trial). The President may reasonably decide to withhold the report now, based upon the ongoing decision-making process and international negotiations. At the same time, section 232 contemplates disclosure in the future, and the Executive Branch has a long-standing practice of disclosing these reports upon the disposition of the relevant matters. But insofar as the deliberative process remains ongoing and disclosure would risk impairing ongoing negotiations, we believe that the President may direct the withholding of the report at this juncture, notwithstanding section 112's publication requirement.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office Legal Counsel*